**VITARROZ CORPORATION, Plaintiff-Appellant,**

v.

**BORDEN, INC., Defendant-Appellee.**

**No. 436, Docket 80–7689.**

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1981.

Decided March 30, 1981.

S. Stephen Baker, New York City (Stephen L. Baker, New York City, on the brief), for plaintiff-appellant.

Albert Robin, New York City, for defendant-appellee.

Before FEINBERG, Chief Judge, NEWMAN, Circuit Judge, and MISHLER,* District Judge.

NEWMAN, Circuit Judge:

This is an appeal from a judgment of the District Court for the Southern District of New York (Gerard L. Goettel, Judge), dismissing after a bench trial a suit for trademark infringement. The issue on the merits is whether the District Court properly denied the plaintiff's request for an injunction, even though the marks of the plaintiff and defendant are virtually identical and their products share at least some competing uses. We conclude that the District Court was entitled to deny injunctive relief upon its consideration of all the relevant factors, including the balance of equities.

Facts

Plaintiff-appellant Vitarroz Corporation sells food products primarily in the New York-New Jersey metropolitan area to approximately 4,000 retail stores, one-half of which are small bodegas catering to a Spanish-speaking clientele. Vitarroz conducts its advertising in Spanish, and its name is well known in the Hispanic market. Its present volume of sales is approximately $17 million per year, 70–75% of which derives from the sale of rice.

In July 1976, Vitarroz decided to add an "all purpose cracker" to its line of food products under the name BRAVO'S. After selecting this name, Vitarroz conducted a trademark search for the name BRAVO. The search disclosed reported uses of BRAVO for a wide variety of food products, including macaroni, olives, spaghetti sauces, corned beef, roast beef, and cheese; state registrations of BRAVO for food and food ingredients, vegetable oil, olive oil, olives, and alcoholic beverages; and federal registrations of BRAVO for canned meat, vegetables, fish, spaghetti sauce, alimentary paste, powders for making soft drinks, and wines. Vitarroz previously had registered eight marks for some of its other products, but it did not file an application to register BRAVO'S for its crackers.

Vitarroz introduced its BRAVO'S crackers in November 1976. The crackers look and taste like Ritz crackers. They may be eaten plain, topped with a variety of spreads, served with hors d'oeuvres, or used as a scoop for dips. The crackers are packaged in a box. The VITARROZ mark appears at the top of the face of the box in

---

* The Honorable Jacob Mishler of the United States District Court for the Eastern District of New York, sitting by designation.

large letters. The BRAVO'S mark appears below the VITARROZ mark in smaller letters. The remainder of the face of the box is devoted to a realistic depiction of the crackers.

Vitarroz's expenses in introducing the crackers were approximately $13,000, a substantial part of which was spent on Spanish-language radio advertising during the period November 24, 1976, to February 27, 1977. Vitarroz has not advertised the product since February 1977. Its total sales of the product during the three and one-half years preceding the trial of this action were about $136,000.

Defendant-appellee Borden, Inc. is a New Jersey corporation having its principal places of business in Columbus, Ohio, and New York City. Borden's Snack Foods Group sells snack foods under the WISE trademark to independent distributors for resale to supermarkets and grocery stores throughout the Eastern United States. The Wise products usually are displayed in what was referred to as a store's "salty, crunchy snack food" section, often in a rack holding only Wise products.

Sometime in 1978, Borden decided to add a round tortilla chip to its line of Wise products under the name BRAVOS. Borden chose the name BRAVOS because of its suggestive meaning of approval and because it has a Mexican flavor, like the chips themselves. Before adopting the name, Borden conducted a trademark search, which disclosed essentially the same information turned up by Vitarroz, but did not disclose Vitarroz's unregistered BRAVO'S mark for crackers.

Borden introduced its BRAVOS tortilla chips in 1979. The tortilla chips resemble ordinary potato chips, though appearing to be slightly thicker. They may be eaten plain or used as a scoop for dips. The chips are packaged in a colorful cellophane bag through which they may be readily seen by the shopper. The bag is dominated by the name BRAVOS appearing at the top, with the BORDEN and WISE marks appearing less prominently, though still boldly, at the bottom. Like other Wise products, the chips usually are stocked in a store's "salty, crunchy snack food" section, often in the Wise rack. In some small stores, however, including some of the bodegas that carry Vitarroz's products, the chips may be found near Vitarroz's crackers.

Vitarroz became aware of the marketing of Borden's BRAVOS chips sometime prior to March 1979. In that month, it filed an application in the United States Patent and Trademark Office to register the BRAVO'S mark for crackers. This application and a similar application filed with New York State authorities were rejected due to federal and state registrations of BRAVO for a variety of other food products.

In May 1979, Vitarroz informed Borden of its use of the BRAVO'S mark on crackers, and proposed that Borden adopt a different mark. Borden replied that it already had spent in excess of $1.3 million in developing good will for its BRAVOS chips, without knowledge of Vitarroz's prior use of the BRAVO'S mark. Borden did not believe that the risk of consumer confusion was sufficiently grave to justify wasting this investment.

Since Borden's receipt of Vitarroz's objection, Borden has continuously advertised and promoted its BRAVOS chips. In 1979, its advertising and promotion costs exceeded $2.5 million. In 1980, its marketing outlays rose to approximately $2.8 million. Borden's total sales of the product from the date of introduction to the time of trial were approximately $9 million.

Vitarroz commenced this suit in New York State Supreme Court for injunctive relief, claiming trademark infringement and unfair competition. The complaint did not specify whether these claims were based on state or federal law. The complaint also claimed trademark dilution, specifically referring to N.Y.General Business Law § 368–d (McKinney 1968). Borden removed the suit to the District Court under 28 U.S.C. § 1441(b) (1976), invoking 28 U.S.C. § 1338(a) (1976), which vests the district courts with jurisdiction over actions arising under any Act of Congress relating to trademarks. Vitarroz did not move to

remand the suit to state court, nor otherwise contest the District Court's jurisdiction. A bench trial ensued.

The District Court first considered jurisdiction and concluded that jurisdiction existed because the suit could have been brought as an original action in federal court under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976). Proceeding to the merits, the Court recognized that the issue was whether Vitarroz had demonstrated a "likelihood" that, as a result of Borden's use of the name BRAVOS, "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1979) *(per curiam), cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Analyzing the likelihood of confusion in light of the factors enumerated in *Polaroid Corporation v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Court found that Vitarroz's BRAVO'S mark is suggestive and has acquired no secondary meaning; that the BRAVO'S and BRAVOS marks, though nearly identical, are presented in different contexts; that "there is some proximity of the goods," in that they share "some areas of competing use"; that "probably no more than 10,000 persons" have purchased Vitarroz's BRAVO'S crackers, and probably "only half of them" purchased the crackers in stores that also stock the defendant's product; and that no actual consumer confusion had been shown. The Court also found that Vitarroz has no interest in bridging the gap and selling its own chips; that Borden's chips are of a very high quality; that Borden adopted the name BRAVOS in good faith, failing, after reasonable effort, to discover Vitarroz's prior use of the BRAVO'S mark only because Vitarroz had failed to register it; and that a grant of the requested injunction would cause Borden to lose most of its multi-million dollar investment in developing good will for its product.

In light of these findings, the District Court concluded that there is no likelihood of confusion as to the source of the goods, and that Borden's use of the name BRAVOS would, if anything, redound to Vitarroz's benefit.[1] Weighing, on the one hand, the slight risk of harm to Vitarroz, and, on the other, Borden's good faith and substantial investment, the Court decided that the balance of equities tipped decidedly in Borden's favor. It therefore declined to enjoin Borden from using the BRAVOS name and dismissed the complaint.

### Discussion

1. The threshold issue concerns subject matter jurisdiction, which we are obliged to consider, even though it has not been questioned by the parties. *Louisville & Nashville R. R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884). The complaint alleges facts to show trademark infringement, a claim that can be cast as a violation of either state law, N.Y.General Business Law § 368–b (McKinney 1968), or federal law, § 43(a) of the Lanham Act. When a trademark infringement claim is based on the Lanham Act,

---

1. The District Court also found some risk that shoppers unfamiliar with either product who are asked to purchase "Bravos snacks" might not know which product to purchase, terming this "a possibility of confusion as to the goods themselves." The Court went on to find that this risk "comes very close to being *de minimis,*" and we agree. However, although a likelihood of confusion as to the goods, rather than as to the source of the goods, has been suggested to be a possible concern in cases involving competing products, *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1134 (2d Cir. 1979), we fail to see the relevance of this factor in this case. Even if the defendant could be considered responsible for creating a risk of such confusion, that risk is irrelevant unless it affects "an appreciable number of ordinarily prudent consumers." *Mushroom Makers, Inc. v. R. G. Barry Corp., supra.* We find no basis in the record for believing that the hypothetical consumer envisioned by the District Court either fits this description or exists in appreciable numbers. There is no evidence in the record that anyone unfamiliar with either product went shopping for an item he knew only as "Bravos snacks," or that any shopper has asked for "Bravos snacks."

federal jurisdiction is provided by both 28 U.S.C. § 1338(a) (1976), which vests the district courts with original jurisdiction over actions arising under any Act of Congress relating to trademarks, and 15 U.S.C. § 1121 (1976), which vests them with original jurisdiction over actions arising under the Lanham Act. If a trademark claim arises under federal law, federal jurisdiction also is available for a related unfair competition claim, 28 U.S.C. § 1338(b) (1976), and pendent jurisdiction may appropriately be exercised over a related state law claim concerning trademark dilution. The problem here is that the trademark infringement claim was not explicitly pleaded as one arising under federal law.

"[T]he party who brings a suit is master to decide what law he will rely upon and therefore does determine whether he will bring a 'suit arising under' [the laws] of the United States by his declaration or bill." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 517 (1913). Since the existence of a federal question must appear on the face of a complaint, *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–04, 39 L.Ed.2d 209 (1974); *Gully v. First National Bank*, 299 U.S. 109, 113, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936), the plaintiff may generally determine by the allegations of his complaint whether or not the case is removable as one arising under the laws of the United States. *Great Northern Railway Co. v. Alexander*, 246 U.S. 276, 282, 38 S.Ct. 237, 239, 62 L.Ed. 713 (1918). Thus, it frequently has been held that a plaintiff alleging facts that would support a claim founded upon either federal or state law is free to confine his claim to one based on state law and proceed in state court. *La Chemise LaCoste v. Alligator Co.*, 506 F.2d 339 (3d Cir. 1974), *cert. denied*, 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975); *Brough v. United Steelworkers of America*, 437 F.2d 748 (1st Cir. 1971); *Peterson v. Brotherhood of Locomotive Firemen and Enginemen*, 272 F.2d 115 (7th Cir. 1959); *Connecticut v. Levi Strauss & Co.*, 471 F.Supp. 363 (D.Conn.1979); 1A Moore's Federal Practice ¶ 0.160 at 185 (2d ed. 1974).[2]

█ Had the plaintiff resisted removal in this case by a prompt motion to remand, we think federal jurisdiction would have been defeated. In that event, the pleader's preference to confine its claim to one based on state law would have been manifest, and a remand to the state court would have been required. However, by not contesting jurisdiction at an early stage, we think the plaintiff permitted the District Court to exercise jurisdiction, since the Court was entitled to conclude that the plaintiff was willing to see its trademark infringement claim treated as one based on federal law. We acknowledge that this approach is a slight departure from the usual rule of testing whether a claim arises under federal law strictly from the face of the complaint. But since the cases recognize that the pleader whose facts would support a federal or a state law claim has an option to invoke or bar federal jurisdiction by the wording of his claim, we see no reason why the option period should end on the day the complaint is filed. Indeed, the Supreme Court has observed that removal jurisdiction may properly be exercised over a com-

---

2. At first glance, *Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801 (2d Cir. 1973), *aff'g* 346 F.Supp. 547 (S.D.N.Y.1972), appears to depart from this line of authority by permitting removal of a trademark infringement claim not explicitly grounded on federal law. Both the District Court, 346 F.Supp. at 548, and this Court, 480 F.2d at 803, observed that the case "could have been" brought in federal court under the Lanham Act. It is not clear whether this meant that the facts alleged in the complaint were sufficient to support a federal claim that "could have been" pleaded, or that the plaintiff did in fact plead a federal claim that

"could have been brought" in federal court. In the Court of Appeals, the appellee urged the latter position, pointing out that papers attached to the complaint were properly to be interpreted as pleading a federal claim. Brief for Warner-Lambert Co. 2, 5. This Court apparently accepted that contention. Thus, *Beech-Nut* does not permit removal of state law claims of trademark infringement, as we made clear in *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 612 F.2d 651, 657–58 (2d Cir. 1979). *See also Connecticut v. Levi Strauss & Co., supra*, 471 F.Supp. at 366–67.

plaint not within the federal court's jurisdiction at the time removal occurred but, because of subsequent developments, within federal jurisdiction by "the time of the actual trial of the case or of the entry of judgment." *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 16, 71 S.Ct. 534, 541, 95 L.Ed. 702 (1951), and cases collected *id.* at 16 n.14, 71 S.Ct. at 541. Our approach does not permit a pleader to invoke federal jurisdiction on a set of facts that cannot be pleaded as a federal claim, nor does it permit the pleader of an ambiguous claim to assert his preference for a state forum after a set of facts that can be pleaded as a federal claim has been removed to federal court and allowed to remain there for some period of time.

■ 2. Turning to the merits of the infringement claim,[3] we are confronted at the outset with Vitarroz's claim that, as the senior user of the BRAVO'S mark for its crackers, it was entitled as a matter of law to an injunction against Borden's use of the virtually identical name BRAVOS for its chips. Vitarroz concedes that this approach is contrary to the "now classic" analysis based on the *Polaroid* factors, *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979), which calls for consideration of, among other things, the balance of equities. It contends, however, that consideration of the *Polaroid* factors is proper only when the products do not compete, on the theory that when products compete, failure to enjoin the junior user is tantamount to depriving the senior user of a property right without compensation.

The issue raised by Vitarroz's argument is not whether the *Polaroid* factors should be ignored entirely, as Vitarroz urges, for the *Polaroid* factors include the similarity of the marks and the "proximity" of the products, the very factors on which Vitarroz bases its asserted right to relief. *See* 287 F.2d at 495. The issue, rather, is whether we should confine our attention to these two factors, and take no account of the others, such as the strength of Vitar-

roz's BRAVO'S mark, the presence or absence of any evidence of actual confusion, the likelihood that Vitarroz will bridge whatever gap currently exists between the products, the defendant's good faith in adopting the name BRAVOS, and the balance of interests. *Id. See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1130–38; *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir. 1964). Or, to put it another way, we must decide whether the full range of *Polaroid*-type factors may be considered when virtually identical marks are used on products that compete to some extent.

Equitable relief historically has not been available as a matter of right, but has been awarded in the court's discretion only upon consideration of all the facts and circumstances, *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Nevertheless, in the trademark context some support can be found for Vitarroz's argument that a plaintiff must prevail when it shows virtually identical marks used for competing products. In *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960), a case decided before *Polaroid,* we stated in *dictum* that when a junior user's product is "in competition" with a senior user's product, the senior user "may" have a right to "automatically enjoin" the junior user, even though the junior user has acted in good faith. 279 F.2d at 613. *See also Yale Electric Corp. v. Robertson,* 26 F.2d 972 (2d Cir. 1928). When *Polaroid* articulated a range of factors for determining a senior user's right to injunctive relief, it pointedly noted that such an approach was to be used "[w]here the products are *different*." 287 F.2d at 495 (emphasis added). In applying the *Polaroid* factors, we have consistently noted that they apply when the products are "non-competing," *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1139, or "different," *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 47, or "non-competitive," *Scarves by Vera,*

---

**3.** Plaintiff's entitlement to relief stands or falls on its infringement claim, and the unfair competition and trademark dilution claims need not be separately considered.

Inc. v. Todo Imports Ltd. (Inc.), 544 F.2d 1167, 1173 (2d Cir. 1976). Our cases demonstrate, moreover, that the likelihood of confusion, the "crucial" issue in a case such as this, *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 47, often depends on the similarity of the marks and the proximity of the products. Thus, when a junior user has affixed a senior user's mark to "substantially identical products directed at the same market and sold through the same outlets," *id.,* we have found a likelihood of confusion as a matter of law. *Id.* at 47–48 (MUSHROOMS women's footwear and MUSHROOM women's sportswear). *See, e. g., American Home Products Corp. v. Johnson Chemical Co.,* 589 F.2d 103 (2d Cir. 1978) (ROACH MOTEL insect trap and ROACH INN insect trap); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097 (2d Cir. 1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970) (KIKI pantyhose and KIKI tights). *See also Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), supra* (VERA high-fashion women's scarves and sportswear and VERA cosmetics and toiletries).

In no case, however, have we determined a senior user's right to injunctive relief solely on the basis of the similarity of the marks and the proximity of the products. Our statement in the *Avon* case raising the possibility of such a restricted analysis rested on citation of *La Touraine Coffee Co. v. Lorraine Coffee Co.,* 157 F.2d 115 (2d Cir.), *cert. denied,* 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946), but in that case the majority weighed the defendant's interest in avoiding an injunction, 157 F.2d at 119, and stressed the defendant's bad faith, *id.* at 118. *See id.* at 123 and n.14 (Frank, J., dissenting). Such a flexible approach also is evident in our other pre-*Polaroid* decisions. *See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,* 281 F.2d 755 (2d Cir. 1960); *Dwinell-Wright Co. v. White House Milk Co.,* 132 F.2d 822 (2d Cir. 1943); *S. C. Johnson & Son, Inc. v. Johnson,* 116 F.2d 427 (2d Cir. 1940); *Anheuser-Busch, Inc. v. Budweiser Malt Products Corp.,* 295 F. 306 (2d Cir. 1923); *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F. 407 (2d Cir.

1917), *cert. denied,* 245 U.S. 672, 33 S.Ct. 222, 62 L.Ed. 540 (1918). Even in *Avon* the Court considered the balance of equities in concluding that the senior user was not entitled to relief. *See* 279 F.2d at 614.

Since the *Polaroid* decision, we have consistently considered all the *Polaroid* factors, including the junior user's good faith, despite the similarity of the marks and the close proximity of the products. *See, e. g., American Home Products Corp. v. Johnson Chemical Co., supra* (ROACH MOTEL insect trap protected against ROACH INN insect trap); *Mushroom Makers, Inc. v. R. G. Barry Corp., supra* (MUSHROOMS women's footwear not protected against MUSHROOM women's sportswear); *McGregor-Doniger Inc. v. Drizzle Inc., supra* (DRIZZLER men's golf jackets not protected against DRIZZLE women's coats); *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), supra* (VERA high-fashion women's scarves and sportswear protected against VERA cosmetics and toiletries); *King Research, Inc. v. Shulton, Inc.,* 454 F.2d 66 (2d Cir. 1972) (SHIP–SHAPE comb and brush cleaner for women and men not protected against SHIP SHAPE hair spray for men); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra* (KIKI pantyhose protected against KIKI tights); *Chandon Champagne Corp. v. San Marino Wine Corp., supra* (DOM PERIGNON imported champagne not protected against PIERRE PERIGNON domestic champagne); *Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196 (2d Cir. 1962) (TRIUMPH women's stockings not protected against DISTINCTION BY TRIUMPH OF EUROPE women's foundation garments). Indeed, rather than eschew consideration of any of the *Polaroid* factors, we have added to the original list, just as *Polaroid* anticipated, 287 F.2d at 495 (in determining the propriety of injunctive relief, "the Court may have to take still other variables into account"). *See, e. g., McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d 1140 ("this Court has frequently supplemented its consideration of the *Polaroid* factors by balancing the conflicting interests of the

parties involved"); *Chandon Champagne Corp. v. San Marino Wine Corp., supra,* 335 F.2d at 536 (considering, in addition to the original *Polaroid* factors, the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user against the benefit to the senior user that would result from the requested injunction).

Vitarroz argues that the products in this case are more closely related than the products in our prior cases. It is difficult to see, however, how crackers and chips are more closely related than two different brands of insect traps, or men's cream hairdressings, or coffees. Nor do they appear to be more closely related than women's footwear and sportswear, or pantyhose and tights. Analysis of the proximity of the products demonstrates, moreover, that the competitive gap between them is not so narrow as to leave no room for consideration of other factors.

In assessing product proximity, we have considered the nature of the products themselves and the structure of the relevant market. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1134–35. *See also Continental Connector Corp. v. Continental Specialties Corp.,* 492 F.Supp. 1088, 1096–97 (D.Conn.1979); 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 82.2(c), at 807 (3d ed. 1969). Taking these criteria in turn, we note that the products in this case differ in ways that may be deemed material to consumers. Although both are snack foods that can be eaten plain or used as a scoop for dips, only the crackers are ordinarily buttered or served with hors d'oeuvres. In addition, the ingredients of the products are markedly different. The crackers are flour-based and essentially bland, while the chips are corn-based, heavily salted, and spicy. The products also differ in the ways they are prepared; the crackers are baked, but the chips are fried.

With regard to the structure of the market, both products are eventually sold to consumers in retail stores. However, since "modern marketing methods tend to unify widely different types of products in the same retail outlets or distribution networks," *Continental Connector Corp. v. Continental Specialties Corp., supra,* 492 F.Supp. at 1096, this factor is not of overriding importance. Within retail food stores, the record shows that the products are shelved in different sections whenever space permits, the crackers in the "cookies and crackers" section, and the chips in the section for "salty, crunchy snacks." More important, the record shows that Vitarroz targets its product at a distinct group of consumers, who shop for the Vitarroz name in specialty stores, many of which do not carry Borden's chips. This factor is entitled to some weight, just like the analogous factor of the sophistication of the relevant purchasers. *See McGregor-Doniger Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1137–38; *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 (2d Cir. 1978); *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971).

The plaintiff's *per se* rule based on the similarity of the marks and the competition between the products could be justified only if we could say with reasonable certainty that injury to the plaintiff is inevitable. *See Avon Shoe Co. v. David Crystal, Inc., supra,* 279 F.2d at 613. The Lanham Act protects the plaintiff against three types of injury: loss of patronage, loss of reputation, and limitation on business expansion. *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), supra,* 544 F.2d at 1172; *Federal Tel. & Radio Corp. v. Federal Television Corp.,* 180 F.2d 250, 251 (2d Cir. 1950); *S. C. Johnson & Son, Inc. v. Johnson,* 175 F.2d 176 (2d Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); *Continental Connector Corp. v. Continental Specialties Corp., supra,* 492 F.Supp. at 1094. Injury of this kind might be inevitable when the marks and products are practically identical and the products are interchangeable for all or at least all significant uses. *See Omega Importing Corp. v. Petri-Kine Camera Co., supra,* 451 F.2d at 1195. But that is not

this case.[4] When, as here, the products differ in non-trivial respects and share only "some areas of competing use," and the trier has found no significant risk of injury to the senior user, the merits may be "close" and "vexing," *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 48, but that circumstance only underscores the need for comprehensive analysis of all the relevant facts and circumstances.

We therefore agree with the District Court's comprehensive approach and turn to consideration of its conclusions and subsidiary findings. Our function is not to consider the issues *de novo,* but to be sure the District Court applied the correct legal standard and correct criteria to findings that are not clearly erroneous. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1139 (and cases cited). The District Court's conclusion that Vitarroz failed to demonstrate a likelihood of confusion as to the source of the goods may seem surprising, for the marks and products appear to be no more different than the marks and products in the cases in which we found a likelihood of confusion as a matter of law. *See, e. g., Mushroom Makers, Inc. v. R. G. Barry Corp., supra; Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), supra; Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra; Avon Shoe Co. v. David Crystal, Inc., supra.* Nevertheless, having examined the District Court's subordinate findings as to each of the *Polaroid* factors bearing on the likelihood of confusion, we conclude they are not clearly erroneous and adequately support the Court's conclusion.

Vitarroz does not contest the finding that its BRAVO'S mark is suggestive, rather than arbitrary or fanciful, *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d

4, 9 (2d Cir. 1976), and there is no evidence that the mark has acquired secondary meaning. Though a suggestive mark can have "strength" within the meaning of the *Polaroid* formula without proof of secondary meaning, *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1132; *see Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 48, the District Court was entitled to consider the absence of such evidence as a factor weighing against a finding of a likelihood of confusion. *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1130–31.

Moreover, the record affirmatively shows that the plaintiff's mark has not acquired secondary meaning. Prior to Vitarroz's adoption of the mark, BRAVO had been registered by others for a variety of food products. Invoices introduced by Vitarroz to establish the sales performance of its crackers do not even refer to the BRAVO'S mark. The crackers are listed on the invoices simply as "10–12 oz Vitarroz All Purpose Cr." In addition, the price list Vitarroz supplies to its retail accounts incorrectly refers to the product as BRAVO crackers, rather than as BRAVO'S. When the user of a mark exhibits so little regard for it, it is difficult to avoid the inference that the mark means little to others.

The Court's finding that the marks are virtually identical is not disputed. We agree with the District Court, however, that the potential for confusion inherent in the similarity of the marks is reduced by the differing contexts in which the marks are presented. Vitarroz's cracker box subordinates the BRAVO'S mark to the VITARROZ mark, which appears to be the only mark of any commercial significance to Vitarroz or its special market. Likewise, Bor-

4. We do not, of course, decide that a *per se* rule entitling a senior user to injunctive relief on the basis of the identity of the marks and products would ever be appropriate. Prior to the decision in *Polaroid,* we demonstrated how such a rule, allowing a senior user a "premonitory lien" on a "future" or "adjacent" market could lead to "great injustice." *S. C. Johnson & Son, Inc. v. Johnson, supra,* 175 F.2d at 180. *See Dwinell-Wright Co. v. White House Milk Co., Inc., supra; Emerson Electric Manufacturing*

*Co. v. Emerson Radio & Phonograph Co., supra.* These cases serve equally well as illustrations of how unfairly such a rule could operate even when the products compete in the same market. The increased proximity of the goods in such a case might enhance the likelihood of confusion, and hence the possibility of injury to the senior user, but injunctive relief still could inflict harm on the junior user out of all proportion to the harm that its refusal would cause the senior user.

den's chips bag prominently displays both the BORDEN mark and the familiar Wise owl, and these marks probably have a greater significance for snack food customers than the name BRAVOS. When similar marks are always presented in association with company names, the likelihood of confusion is reduced. *See McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1134. Finally, as we have noted in rejecting the plaintiff's *per se* rule, the products differ in significant respects and are not competitive as to certain significant uses.

Even if the District Court erred in failing to find a likelihood of confusion as to the source of the goods, it was entitled to deny an injunction upon consideration of all the *Polaroid* factors and other pertinent equitable factors. *See Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 49; *Avon Shoe Co. v. David Crystal, Inc., supra,* 279 F.2d at 613; *S. C. Johnson & Son, Inc. v. Johnson, supra,* 175 F.2d at 179–80.

The District Court's subsidiary findings with regard to these factors are not contested. Vitarroz admits that it has no interest in selling chips so as to bridge the gap that currently exists between the products. It also admits that Borden's chips are of the highest quality, and it does not quarrel with the finding that Borden's use of the name BRAVOS will, if anything, redound to the benefit of Vitarroz. There is no dispute that Borden, in good faith, adopted the name BRAVOS and devoted substantial investment to developing good will for it, without knowledge of Vitarroz's prior use and after reasonable effort to discover all prior uses. Finally, Vitarroz recognizes that any injury to its interest is far outweighed by Borden's interest in retaining the good will developed as a result of its multi-million dollar investment.[5]

These factors distinguish this case from such cases as *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra,* where a "finding of bad faith could not very well be

avoided," 411 F.2d at 1101, and place it squarely within the scope of such cases as *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* and *Avon Shoe Co. v. David Crystal Inc., supra,* where we held that the District Courts properly denied injunctive relief, despite a likelihood of confusion as to the source of the goods, because the balance of equities tipped decidedly in favor of the junior user. In conformity with all these cases, we hold that the denial of Vitarroz's request for an injunction was proper.

Judgment affirmed.

---

5. In this connection, it should be noted that the denial of an injunction here does not have the effect of depriving Vitarroz of any property interest. The company remains free to use the

BRAVO'S mark for its crackers, and thus has not been compelled to write off its own relatively modest investment in development of the mark.